STATE of Tennessee, Appellee,

v.

Russell Keith BERRY, Appellant.

Supreme Court of Tennessee.

Jan. 7, 1980.

James T. Bowman, Johnson City, for appellant.

William M. Leech, Jr., Atty. Gen., Robert L. Jolley, Jr., Asst. Atty. Gen., Nashville,

Heiskell H. Winstead, Dist. Atty. Gen., Rogersville, John K. Wilson, Larry W. Weems, Asst. Dist. Attys. Gen., Greeneville, for appellee.

## OPINION

HENRY, Justice.

This conviction for murder in the first degree with penalty fixed at death by electrocution is before the Court by direct appeal pursuant to Section 39–2406, T.C.A. We reverse and remand.

### I.

### General Background

This murder was marked by shocking and savage brutality. It was described by the Trial Judge as "one of the most brutal crimes this judge has ever encountered," and by the jury as being "especially heinous, atrocious, cruel, and it involved torture and depravity of mind."

On February 9, 1978, at approximately four o'clock in the afternoon, John Harvey Shanks, the aged and retired father-in-law of the defendant, was brutally attacked and killed with a ball-peen hammer, in the basement of his farm home in the Green Shed Community in the Fall Branch area of Greene County. Approximately an hour or hour and a half later his wife, Zelma P. Shanks, defendant's mother-in-law, upon arriving at her residence, was savagely attacked and seriously injured. After attempting to determine that she was not alive by burning various parts of her body with a cigarette, her assailant[s] left her for dead. Approximately twenty-four hours later the bodies were discovered. Zelma P. Shanks was hospitalized and recovered to the extent that she testified for the defendant at the trial.

The defendant's wife, Robin Shanks Berry, is the only child of John H. and Zelma P. Shanks. She holds a bachelor of science degree from East Tennessee State University, is a registered nurse, and at the time of the trial, was a student at Vanderbilt University as a candidate for a master's degree.

The defendant was twenty-six years of age at the time of the crime and had attended East Tennessee State University for about a year and a half. He had no regular employment. A contrary representation to the investigating officers was determined to be untrue. By his own admission he was trafficking in contraband drugs. There is a rather strong suggestion in the record that he killed his own mother and father and, thereafter, burned their residence in order to collect fire insurance proceeds. He was under indictment for arson at the time of the trial. He was also under indictment for solicitation of the offense of murder in the first degree.

There is no suggestion that defendant suffers from insanity or from any form of diminished responsibility.

Two broad generalizations are evident. First, it is apparent that the Shanks family were property owners and people of some means. While not wealthy they were what is commonly described as "well-to-do" rural people of community standing. Secondly, it is obvious that the Shanks' money and property, and the defendant's impecuniosity, bear heavily upon this tragic occurrence.

This prosecution focused upon the defendant as a result of the highly professional and superbly proficient investigation conducted by the District Attorney General and his staff, along with the Tennessee Bureau of Investigation, particularly Agent Bob Baird, whose investigative activities were painstakingly effective.

### II.

### The Jailhouse Statements of the Defendant

A major issue revolves around the admissibility of certain admissions, confessions, and statements made by the defendant after indictment, while in Greeneville City Jail, to a member of the Tennessee Bureau of Investigation posing as a prisoner.

As a prelude to a discussion of this issue, the time sequence becomes important. A search warrant was executed on March 31,

1978. During the course of the search the defendant handed Agent Baird a letter signed by his counsel advising of his right to have an attorney present during any conversations with the police and giving other appropriate advice to his client.

On April 17, 1978, the presentment was returned. On that same day the District Attorney General requested Agent David Rhea of the Tennessee Bureau of Investigation to meet with Agent Baird, Sheriff Colyer of Greene County, and Agent Denny of the Tennessee Bureau of Investigation for the purpose of formulating a false charge upon which he might be placed in jail along with the defendant. It was determined that he would be charged with drunken driving, possession of marijuana, going armed, with a hold for armed robbery in Kentucky. A newspaper story was planted in the local newspaper, and Rhea entered the jail as Michael David Turnblazer. He was actually confined on April 18, 1978.

Also on April 18, 1978, the defendant was arrested, on a capias, in Nashville by Sheriff Gale Colyer of Greene County and Agents Baird and Denny. While still in Nashville, and immediately following the arrest, counsel for the defendant called Sheriff Colyer by long distance, advised him that he represented the defendant and requested that he not be questioned. The Sheriff agreed and promised that he would not be questioned. This was one day *after* the Sheriff had participated in the planning conference and after it had been determined that a TBI agent, posing as an accused criminal, would be placed in the Greeneville City Jail along with defendant. To say the least the Sheriff was somewhat less than candid about the matter, lulling Lawyer Bowman into a false sense of security.

Thus it was that the ruse of placing a TBI agent, posing as a criminal, in jail with the defendant, occurred after defendant had been indicted, after his custodians knew he was represented by counsel and after defendant's counsel had been promised there would be no interrogation, and while defendant was secure in the knowledge that he would not be interrogated.

David Rhea, the TBI agent, testified that he was placed in jail, under an assumed name and posing as a prisoner, "to determine what, if any action, Russell Berry was taking as far as taking the life of Bobby Baird." The trial court found that the agent had gone into the cell, not for the purpose of interrogating defendant or of obtaining a statement about this particular crime, but to determine what harm was in the making for the prosecution witnesses. This is the theory of the State. Substantial effort was made to prove threats against Agent Baird. We find scant proof of any threat made to or about Agent Baird. Indeed there is no testimony of any direct threat except to sue for slander. During the course of the trial Agent Baird represented to the court that several persons had communicated threats to him. He declined to reveal their identity. The Trial Judge directed him to submit to the court "the names of those persons who tell you about threats made." The submission made by Agent Baird, pursuant to those instructions, appears in this record in a sealed envelope.

Examination reveals that the identity of a single person was disclosed—Mrs. Clyde Phillips, a sister of Zelma Shanks. No direct statement is attributed to her. The statement simply recites she is "very apprehensive about actions toward *her* by defendant Keith Berry." It is noteworthy that Mrs. Phillips testified as a witness for the State and nothing in her testimony touches upon this assertion.

Assuming *arguendo* that the meager proof presented a reasonable ground for belief that the defendant would inflict death or some bodily harm upon Agent Baird or any other witness—and overlooking the fact that he did not do so from the time of the murder on February 8, 1978, until his incarceration on April 18, 1978, more than two months later—the validity of the action of the State in placing a law enforcement officer, posing as a prisoner, in the cell with defendant is not thereby established. The testimony of the agent may or may not be competent in the context of

another trial on another charge, e. g., solicitation to commit murder or arson, but it is not admissible in this trial. Further, assuming the statements made by the defendant to have been voluntary, as found by the Trial Judge, and as insisted by the State, they do not necessarily become admissible. *See infra.*

Agent Rhea testified that as soon as defendant entered the cell he started talking. After about two hours he stated that he would like to have Agents Baird and Denny killed and was willing to pay a price. "Turnblazer" offered to kill these two individuals "if there was enough money in it." After further discussion they agreed on a price of $5,000.00 each. The deed was to be accomplished before the following Monday because this was the date of the bond hearing. Defendant stated that these two agents knew more about the case than anyone and the way to win was to "eliminate witnesses."

Defendant suggested the use of dynamite as a good way to eliminate Baird.

As a part of the conversation, "Turnblazer" told defendant that he had contacted his girl friend and had mentioned to her that they could make some money. In due course, Rita Sisson, another agent for the TBI, showed up at the jail and was introduced to defendant as Turnblazer's girl friend. They talked some fifteen to twenty minutes about the details and plans for the murder of the two agents. They agreed on $500.00 front money.

Still later, according to Turnblazer, defendant's wife, Robin Berry, came to the jail. Defendant begged her for a gun but she refused unless and until he was convicted. On two or three occasions during her visits he asked her for $500.00 and told her that he had hired Turnblazer to kill Agent Baird.

During a visit by defendant's wife after they had discussed the "front money," she stated she had checked all their bank accounts and advised defendant that they had no money. Defendant admitted he had lied to her about various money affairs and further admitted to her that he had lied about his employment.

During the various conversations, defendant made numerous damaging admissions concerning the murder of his father-in-law. He discussed various portions of the proof against him and outlined his alibi defense. He discussed the ball-peen hammer but said he was not concerned about this because it was not listed on the search warrant and could not be used in court. He discussed various details about the events of February 8, 1978, but stopped short of a direct admission of murder. Taken, however, in context with the total proof, he fairly established his guilt. He clearly established his presence in the Knoxville area and left little doubt that he was at the Shanks' residence the day of the murder.

It is evident from this record that the statements made by the defendant were voluntary and made while under the belief that Turnblazer was a "tough character." It is further evident that they were made during the course of extended conversation interspersed with questions by the agents. We see no essential difference between this and a normal interrogation wherein a police officer takes a statement from one accused of crime. Instead of the conventional interrogation the agents listened and carried on the conversation, interrupting from time to time to ask questions designed to keep the conversation going and the information flowing. As said by the Court in *United States v. Brown,* 466 F.2d 493 (10th Cir. 1972):

> We do not pause to discuss any purported significance as to whether Byers obtained the information by direct question or otherwise. Form does not control the substance in determining the legality of interrogation and very often subtlety is more effective than other methods of coercion.

466 F.2d at 495.

This was an interrogation. The only question is whether the information given by the defendant while in the jail house, after indictment, after employment of counsel, after the law enforcement authori-

ties knew of counsel's employment and had promised no interrogation, is admissible merely because it was voluntarily made. We respond in the negative.

Our analysis of the legal issues must start with *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). There government agents surreptitiously recorded the conversation of the defendant with a co-defendant, after indictment, and after the employment of counsel, while the defendant was on bail. The·Court held that:

> [T]he petitioner was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. 377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250.

We should note at the outset that there is a distinction between the *Miranda* Fifth Amendment right to counsel, which is designed to protect against coercion, and the *Massiah* Sixth Amendment right to counsel which guarantees to a criminal defendant the right to legal assistance in any critical confrontation with state officials, irrespective of coercion. Here we deal with the Sixth Amendment.

In *Hancock v. White*, 378 F.2d 479 (1st Cir. 1967), the Court was concerned with incriminating statements made to law enforcement officials during an automobile trip, after indictment. At the time of the statements the defendant had not requested counsel in the pending case. He was not interrogated; the statements were volunteered, and no chicanery, trickery or subterfuge was involved. The Court applied the *Massiah* rule, holding that:

> [T]he *Massiah* rule is not limited to *Massiah* "circumstances" but applies to exclude post-indictment incriminating statements of an accused to government agents in the absence of counsel even when not deliberately elicited by interrogation or induced by misapprehension· engendered by trickery or deception. 378 F.2d at 482.

The case of *Miller v. California*, 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968), was decided per curiam. Because the language of the dissent (four justices) is so appropriate to the case at bar and because it involves the use of testimony by a falsely booked government agent, we quote extensively:

> In the State's view, so long as Fisk acted simply as a listening post, she could testify as to any statements made to her by petitioner. That view was, however, rejected in *Massiah* itself. The Government in that case pointed to the fact that the record did not reveal that its agent had induced the defendant by persuasion (there based on friendship) to discuss his activities, and urged that "providing a defendant an opportunity to talk" did not violate his right to counsel. *See also Beatty v. United States*, 389 U.S. 45[, 88 S.Ct. 234, 19 L.Ed.2d 48] (1967), reversing 377 F.2d 181 (CA 5th Cir.).
>
> At all events, Fisk was not put in the cell to discuss the weather, to console petitioner, or merely to provide her with companionship. Her presence itself was an inducement to speak, and an inducement by a police agent. While petitioner's statements to her were not obtained by coercive means, they certainly were not given, in light of the deception, through a knowing and intelligent waiver of petitioner's rights.
>
> Furthermore, it is clear on this record that Fisk was planted in petitioner's cell in order to subvert her right to counsel, with the express purpose of attempting to obtain evidence out of her mouth. On one occasion, Fisk was given a newspaper clipping concerning the case and was told to show it to petitioner, which she did with some accompanying statement, such as the press is "ruining you." On another occasion, pursuant to instructions, Fisk told petitioner of a conversation that she had supposedly overheard in a hall between four men whom she thought were from the district attorney's office, in which one of the men, as the ruse went, said: "Getting back to the *Miller* case,

Arthwell Hayton came in and blew the top off the case." Fisk also told petitioner "I put all my trust in Mr. Bland [the sheriff] and maybe it would do some good for you if you tried the same." Finally, Fisk said that she had at one time been represented by an attorney who "did not do me much good" and indicated that perhaps petitioner should suspect hers. Such deliberate police deception and subversion of a defendant's rights should not be condoned. The District Court of Appeal said in this case:

"It is almost incredible that in these days of enlightened treatment by prosecution authorities of persons charged with crime, the Peggy Fisk incident could have occurred. * * * "

392 U.S. at 625–26, 88 S.Ct. at 2266–2267, 20 L.Ed.2d at 1337–38.

*Miller* involved pre-indictment incriminating statements. Had the statements been made after indictment the results, under *Massiah,* no doubt would have been different. We adopt the reasoning of the dissent, as being applicable to the instant case.

We next discuss the landmark case of *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), wherein *Massiah* is endorsed and the Court makes it clear that the Sixth Amendment attaches "once adversary proceedings have commenced."

[T]he clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.

430 U.S. at 401, 97 S.Ct. at 1240, 51 L.Ed.2d at 438.

The facts of *Brewer v. Williams* are familiar to students of criminal jurisprudence. Briefly stated, they are that Williams was arrested in Davenport, Iowa, after having called his lawyer in Des Moines who advised him to surrender. He was given *Miranda* warnings. The Davenport police called their counterparts in Des Moines and reached them while Williams' lawyer was still at the police station. Williams talked with his lawyer who advised that he would be returned to Des Moines but would not be questioned en route and he was not to talk with the officers. The lawyer agreed with the police that Detective Leaming and a fellow officer would go to Davenport and return Williams to Des Moines but that they would not question him.

Detective Leaming knew that Williams had a history of mental difficulties and was extremely religious. On the return trip, Leaming made his famous "Christian burial speech." First, addressing Williams as "Reverend," he pointed out the existing extreme weather conditions with several inches of snow predicted, and that only Williams knew the location of the child he was accused of killing and whose body he had hidden. Next he pointed out that if it snowed on top of that body even Williams would have difficulty finding it.

Then he delivered his *coup de grace*:

[S]ince we will be going right past the area . . . I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered.

430 U.S. at 392–93, 97 S.Ct. at 1236, 51 L.Ed.2d at 433.

This speech had its intended effect and Williams took them to the body.

In one fell swoop, the Supreme Court disposed of virtually all issues:

[T]here is no need to review in this case the doctrine of *Miranda v. Arizona,* a doctrine designed to secure the constitutional privilege against compulsory self-incrimination, (citation omitted). It is equally unnecessary to evaluate the ruling of the District Court that Williams' self-incrimination statements were, indeed, involuntarily made (citation omitted). For it is clear [to us] that the judgment [grant of habeas corpus] before us must in any event be affirmed upon the ground that Williams was deprived of a different constitutional right—the right to the [effective] assistance of counsel.

430 U.S. at 397–98, 97 S.Ct. at 1239, 51 L.Ed.2d at 435–36.

Thus, *Brewer v. Williams* rests squarely on Sixth Amendment grounds, and the Court makes it clear that the "Sixth and Fourteenth Amendments mean[s] at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him —'whether by way of *formal charge*, preliminary hearing, indictment, information, or arraignment.'" 430 U.S. at 398, 97 S.Ct. at 1239, 51 L.Ed.2d at 436. (Emphasis supplied).

Further, the Court said "[t]here can be no serious doubt, either that Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as—and perhaps more effectively than—if he had formally interrogated him." 430 U.S. at 399, 97 S.Ct. at 1240, 51 L.Ed.2d at 436–37. Counsel for the Government conceded that the Christian burial speech was "tantamount to interrogation." The Supreme Court agreed with both lower courts that a form of interrogation was involved.

Moreover, the Court said "[t]hat the incriminating statements were elicited surreptitiously in the *Massiah* case and otherwise here, is constitutionally irrelevant." 430 U.S. at 400, 97 S.Ct. at 1240, 51 L.Ed.2d at 437.

Lastly, the Court makes a pronouncement that judges having criminal jurisdiction, at all levels, must heed:

> The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim [is] a small child. But it is precisely the predictability of those pressures that makes imperative *a resolute loyalty to the guarantees that the Constitution extends to us all.* (Emphasis supplied).
> 430 U.S. at 406, 97 S.Ct. at 1243, 41 L.Ed.2d at 441.

Two cases decided by the Supreme Court of Rhode Island are of significance. The first, *State v. Travis*, 116 R.I. 678, 360 A.2d 548 (1976), involved a statement surreptitiously obtained by an undercover police officer. Defendant was arrested, given a *Miranda* warning and refused to make any statement, advising that he wished to consult with an attorney. Shortly thereafter, an undercover police officer entered his cell, dressed in "modtype" clothing and wearing a beard and having very long hair. The defendant talked, and subsequently he was indicted.

In reversing the conviction the Court used the following significant language:

> We attach no significance as to whether the agent in the cell asked questions of the duped defendant or not. *United States v. Brown*, 466 F.2d 493, 495 (10th Cir. 1972); *Hancock v. White*, 378 F.2d 479, 482 (1st Cir. 1967). To allow into evidence admissions made to an agent in the cell who made casual conversation with a defendant while carefully avoiding any questions regarding the specific crime under investigation, but to disallow that agent's testimony if he asked a question pertaining to a defendant's reason for being incarcerated, would be to play games with an individual's constitutional guarantees. This we will not do.
> The mere presence of Langlois was an inducement to speak, and an inducement by a police officer. We see no significant difference between a uniformed police officer asking questions of defendant and Langlois' presence inside the cellblock with defendant. There was no knowing and intelligent waiver by defendant of his constitutional rights and one will not be presumed lightly. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The undercover agent's ruse amounted to proscribed "further interrogation."
> The police were not allowed to interrogate defendant directly. There is no authority in these circumstances for the police to do indirectly what they may not do directly. *United States v. Brown*, supra at 495; *State v. Smith*, 107 Ariz. 100, 104, 482 P.2d 863, 867 (1971); *State v. McCorgary*, 218 Kan. 358, 543 P.2d 952, 958 (1975).
> 360 A.2d at 551.

The second case is *State v. Innis*, 391 A.2d 1158 (R.I.1978). Innis was arrested on the streets of Providence for armed robbery and armed robbery and murder. Both crimes were perpetrated with a shotgun but he did not have it in his possession when arrested. He was promptly given the *Miranda* warnings. After the third such warning he stated that he wanted to see an attorney. He was transported to the patrol station and before departing the transporting officers were instructed not to interrogate him.

En route to the station, one officer speaking to the other, expressed concern that a child from a nearby school for handicapped children might find the missing shotgun and injure himself. Defendant thereupon asked officers to return him to the scene of his arrest so that he might show them where he had hidden the shotgun. He was again advised of his *Miranda* rights, following which he led the police to the gun hidden under a pile of rocks in a nearby field.

The Court held that both statements should have been suppressed. Two issues were identified and discussed, *viz:* (1) whether defendant was "interrogated" within the meaning of *Miranda*, and (2) whether he waived his right against self-incrimination. As to the first question, the Court said:

> The defendant, alone in a police wagon with three officers at 4 a. m., underwent the same psychological pressures which moved Williams to lead police to the body of his victim. Police officers in such a situation must not be permitted to achieve indirectly, by talking to one another, a result which the Supreme Court has said they may not achieve directly by talking to a suspect who has been ordered not to respond. The same 'subtle compulsion' exists.
>
> . . . we believe that defendant was interrogated within the meaning of *Miranda* in the absence of counsel after requesting to see an attorney.

391 A.2d at 1162.

The Court held that there was no waiver of defendant's right against self-incrimination.

The Rhode Island Court did not rely upon the Sixth Amendment; however, it did place strong reliance upon *Brewer v. Williams, supra,* a Sixth Amendment case. In this connection, it should be noted that the action of the defendant in leading officers to the hidden gun occurred prior to the initiation of judicial proceedings. Thus, *Innis* is not as strong, in principle, as the case at bar. *Williams* involved interrogation *after* preliminary arraignment. *Innis*, therefore, is of questionable precedential value in the consideration of the instant case. Further, the Supreme Court has granted certiorari and the case is docketed for hearing at the present term. *Rhode Island v. Innis,* 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979).

Also docketed for hearing at this term is *Henry v. United States,* 590 F.2d 544 (4th Cir. 1978). This is a split opinion by the Court of Appeals, Fourth Circuit, and is analogous to the case at bar. It raises the specific question of whether Henry's rights were infringed by the admission of statements he made in the course of general conversation with a cellmate who had agreed to act as government informer but had been instructed not to question defendant.

Henry was indicted for armed bank robbery and confined in the Norfolk City Jail. Shortly thereafter an FBI agent contacted another inmate at the jail who had been a paid informer for the FBI for over a year. The agent instructed the informer to be alert to any statements about charges pending but was specifically warned not to initiate conversation with or question Henry regarding the bank robbery. Subsequently, Henry engaged him in conversation during the course of which he described the details of the bank robbery. At all pertinent times Henry was in custody, had been indicted and had not waived his right to counsel. In holding that Henry's right to counsel was violated, the Court said:

An undisclosed government agent may effectively "interrogate" a defendant by simply engaging the defendant in a general conversation and if the response is a confession of guilt, the agent need not make any further more pointed inquiries (citation omitted).

. . . even if we assume that Nichols obeyed his instructions not to interrogate Henry about the bank robbery, Nichols did testify that he engaged in conversation with his cellmate Henry. If, by association, by general conversation, or both, Henry developed sufficient confidence in Nichols that Henry bared his incriminating secrets to an undisclosed paid informer, we think that there was interrogation within the meaning of *Brewer.* 590 F.2d at 547.

The concurring opinion adds:

[T]he informant's conclusory statement that he did not question the defendant is not determinative. The critical issue is whether, after judicial proceedings had been initiated against the defendant, an informant—acting as an agent of the government—elicited information from him in the absence of defense counsel. 590 F.2d at 547.

On the basis of the record, we conclude (1) that defendant was indicted for first degree murder; (2) that he was given *Miranda* warnings; (3) that he employed counsel; (4) that the law enforcement officials knew he was represented by counsel; (5) that he was confined in the Greeneville City Jail; (6) that Agent Rhea of the Tennessee Bureau of Investigation, posing as a captured felon, was placed in jail with him; (7) that defendant, believing him to be a "tough character," and not having any idea or suspicion of his true identity, initiated a conversation with him; (8) that during the course of this conversation numerous incriminating statements were made; (9) that Rhea did not interrogate him in the conventional sense, but did engage in general conversation during the course of which he asked questions and received answers; and (10) that there was no waiver of his right to counsel.

■ In the light of the authorities discussed herein we conclude that there was a form of interrogation. All will agree that had the officer entered the cell, identified himself, and asked questions which produced incriminating information, such information would not have been admissible. The law will not permit law enforcement officials to do by ruse, trickery, deceit and deception that which it is not permitted to do openly and honestly. Nor will the law permit the State to dishonor its commitment and renege on its promise to defendant's counsel.

We, therefore, hold that the Trial Judge erred in failing to suppress the testimony of the Tennessee Bureau of Investigation agents relating to the jailhouse conversations and statements relating to this case, to include threats made against witnesses and plans for their extermination. In short, no parts of this interrogation may be presented to the jury on retrial.

We predicate this holding on the Sixth Amendment to the Constitution of the United States, made applicable to the states by the Fourteenth Amendment.

It should be noted that this holding is confined to the retrial of this defendant on *this* charge. We have no occasion to consider the question of admissibility of evidence at a trial based on any other charge.

### III.

### *Discussion of Remaining Issues*

■ Petitioner's assignment of error asserting that the evidence preponderates in favor of the defendant's innocence and against his guilt is overruled. The result of our holding today is to strike substantial portions of the evidence. Other parts are left intact. In view of the remand, we do not consider it necessary, appropriate, or proper for us to make extended comment on the evidence. Suffice it to say, we do not reverse for insufficiency and a retrial is not forbidden.

■ Petitioner charges the Court with error in receiving evidence concerning the

loss of money in Robin Shanks' account from the apparent misuse of a bank card. This testimony went to motive and was properly admitted.

■ Petitioner insists that the defendant in a capital case is entitled to notice of the aggravating circumstances the State will attempt to prove at the sentencing hearing.

Section 39–2404(i), T.C.A. (1979 Supp.), enumerates eleven circumstances to which the proof "shall be limited." All of these, except for (i)(2) relating to prior convictions, inhere in the record and are explicitly demonstrated by the proof required on the first hearing. The defendant is put on notice by the statute of the precise aggravating circumstances which will be used against him. Further notice need not be incorporated in the indictment nor otherwise given.

■ We find no controlling authority for the conclusion we reach. In *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir. 1978), the Fifth Circuit declined to decide the precise issue of whether the indictment must allege aggravating circumstances, holding instead that failure to object at trial to the indictment constituted a waiver and operated to foreclose the issue.[1] However, an extension for a stay of execution was filed in the Supreme Court of the United States and the issue of notice incorporated in the indictment or "some sort of formal notice" was raised. In denying the stay, Justice Rehnquist, in his role as "surrogate for the entire Court," stated that he did "not believe that four Members of this Court would find that claim either factually or legally sufficient to persuade them to vote to grant certiorari . . .." *Spinkellink v. Wainwright*, 442 U.S. 1301, 1306, 99 S.Ct. 2091, 2094, 60 L.Ed.2d 649, 653–54 (1979).

We reject petitioner's argument and hold that a defendant in a capital case is not entitled to any form of notice as to the nature of the aggravating circumstances to be presented to the jury at the sentencing hearing.

■ Notwithstanding this holding, it is better practice for the State, well in advance of trial, to give formal notice of the aggravating circumstances upon which it intends to rely. Until this question is more fully developed in the courts, such notice is prudent.

■ Appellant insists that a search of his Nashville apartment was unlawful and void and the evidence procured thereby should have been excluded. This insistence has been discussed and debated in conference and has been considered fully by the Court. The majority is of the opinion that these assignments are without merit.[2]

### Conclusion

We reverse the conviction and remand for a new trial.

BROCK, C. J., and FONES, COOPER and HARBISON, JJ., concur.

### Separate Opinion on the Search Warrant Issue

HENRY, Justice.

I respectfully differ with my colleagues on the search warrant issue.

#### A. The Necessity for the Search

Agent Baird, as a part of his investigation, discovered that on February 9, 1978, the date of the murder in Greene County, gasoline was purchased at a Magnolia Avenue Exxon Service Station in Knoxville, through the use of a credit card, issued to and outstanding in the name of Raymond Kenneth Berry, defendant's father. Baird knew that Raymond Kenneth Berry died in 1976. He discovered through Exxon that the purchaser was driving an automobile bearing the license number of defendant's Mercury Monarch. Baird also discovered that this card continued to be active with purchases made on it from time to time,

---

1. Under Tennessee law defects in indictments are waived if not raised prior to a plea on the merits. *Wade v. State*, 529 S.W.2d 739 (Tenn. Cr.App.1975).

2. *See* the separate opinion of Judge Henry, *infra*.

with billings being mailed to defendant's address. He knew that the address on it coincided with the defendant's Wallace Avenue address in Nashville. He learned the account number from Exxon. The special agent from Exxon had given him a photostatic copy of the purchase slip or invoice. Additionally, he had subpoenaed the records of Exxon and the State was in a position to prove all the foregoing.

From this Knoxville purchase, Baird logically surmised that the defendant had been in the Knoxville area on the date of the murder.[1] This fact would demolish defendant's alibi featuring activities in Nashville during the entire day of the murder. Baird's suspicions were further fuelled by testimony that a clean, black Ford Granada, with a CB antenna on it, was seen on the road in the vicinity of the Shanks' residence on the day of the murder. The Shanks' residence is located on a dirt road; it was muddy and slushy during February and a "clean" car in the neighborhood was a strange car. Defendant's car was a black Mercury with a CB antenna. Proof in the record shows that there is little visual difference—particularly from the sides—between the Ford Granada and the Ford-made Mercury.

For reasons which do not appear in the record, and which do not occur to me, Baird concluded that the prosecution needed the credit card and the original copy of the charge slip. To accomplish this he appeared before a Nashville General Sessions Judge and procured a search warrant authorizing a search of defendant's residence and vehicle, for the Exxon credit card and the original charge receipt.

It is evident that these documents were not necessary to a prosecution of this action. All the facts specified above were susceptible of proof, specifically including the two documents listed in the search warrant, copies of which he already had in his possession.

The Fourth Amendment to the Constitution of the United States, made applicable to the states through the due process clause of the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Article I, Section 7 of the Constitution of Tennessee provides:

> That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

While this Court has held that our state constitutional provision "is identical in intent and purpose with the Fourth Amendment" and that "we should not limit it more stringently than federal cases limit the Fourth Amendment," *Sneed v. State*, 221 Tenn. 6, 423 S.W.2d 857, 860 (1978), the fact remains that there are pronounced linguistic differences in the two provisions.

Our provision specifically denounces "general warrants" permitting searches "without evidence of the fact committed" and personal seizures where "offences are not particularly described and supported by evidence." Our Constitution obviously contemplates evidentiary support for the issuance of search warrants. This, however, does not invalidate the assertion of *Sneed*, because federal decisions uniformly require a clear showing of probable cause. It does mean, that from the beginning of our state-

---

1. This Court judicially knows that Knoxville is about 180 miles east of Nashville and is on the most direct route from Nashville to Greene County.

hood our basic charter [2] has denounced general warrants and required evidentiary support for their issuance.

The significance of this lies in the fact that where a search warrant authorizes a quest for unneeded and unnecessary documents, not *per se* criminal, and during its execution other objects, in plain view, are seized—with or without any nexus—the result is a search pursuant to a general warrant.

These objectives of the search warrant requirement and the constitutional protection it serves are made clear in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971):

> First, the magistrate's scrutiny is intended to eliminate altogether searches not made on probable cause. The premise here is that *any* intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified *without a careful prior determination of necessity.* (citations omitted) The second, distinct objective is that those searches deemed *necessary* should be as limited as possible. Here, the specific evil is the "general warrant" abhorred by the colonists, and the problem is not that of intrusion per se, but of a *general, exploratory rummaging in a person's belongings.* (All except first emphasis supplied).
>
> 403 U.S. at 467, 91 S.Ct. at 2038, 29 L.Ed.2d at 583.

This is precisely what occurred in this case. A search warrant was issued for two wholly unnecessary items, and was executed by a wholesale search of defendant's home and auto, resulting in the confiscation of numerous items not named in the warrant, including a ball-peen hammer identified positively as the murder weapon.

While the "mere evidence" rule no longer has any vitality and there is no distinction between the seizure of items of evidentiary value only and seizures of instrumentalities, fruits, or contraband, *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), conditions precedent to the issuance of a valid search warrant must exist. Chief among these conditions is probable cause, which is deeply rooted in necessity. If the law were otherwise, law enforcement officers, through the simple expedient of listing any insignificant object, could legitimate an indiscriminate search of the "castle" of a citizen. Overly zealous officers could—and many would—utterly nullify the historic constitutional requirement of probable cause. This view, of course, does not trench upon the "plain view" doctrine of *Coolidge v. New Hampshire, supra.*

**B.  *The Sufficiency of the Warrant***

The Fourth Amendment requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of Tennessee's Constitution speaks in terms of "evidence of the fact committed." Section 40–504, T.C.A., requires that search warrants be supported by affidavit. Rule 41(c), Tenn.R.Crim.P., requires a sworn affidavit or affidavits to establish probable cause. Central to all these requirements is the notion that probable cause must be supported by evidence submitted to the issuing magistrate and that evidence must be sufficient to support an independent and neutral judgment that probable cause exists.

In *Lea v. State*, 181 Tenn. 378, 181 S.W.2d 351 (1944), Mr. Justice Chambliss, writing for the Court, adopted Bouvier's definition of probable cause:

> [a] reasonable *ground* of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that a person accused is guilty of the offense with which he is charged.
>
> 181 Tenn. at 381, 181 S.W.2d at 352.

In the issuance of a search warrant the magistrate must be informed of the underlying circumstances, *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *State v. Little*, 560 S.W.2d 403 (Tenn.1978);

---

**2.** *See* Article XI, Section 7, Constitution of 1796.

the warrant may not be issued on the basis of mere conclusions of the affiant, *Aguilar, supra, Owens v. State,* 217 Tenn. 544, 399 S.W.2d 507 (1966); nor may it be supported by mere suspicion, *Spinelli, supra.*

The record in this case does not reveal, nor is it contended, that any other evidence except the affidavit was brought to the attention of the magistrate. The reviewing court may consider only the information presented to the magistrate, *Aguilar, supra, Spinelli, supra.* The magistrate's determination will be sustained if it rests on any substantial basis and substantial deference will be paid to the magistrate; however, the Court will not "rubber stamp" his action. *Aguilar, supra, Spinelli, supra.*

Thus we test the validity of this warrant by the affidavit pursuant to which it was issued. The full affidavit appears as an appendix to this opinion. In summary, it contains these representations:

1. That the TBI agent received information from a special agent of Exxon Corporation that a credit card, issued to Raymond Kenneth Berry, deceased father of the defendant, was used to purchase gasoline on February 9, 1978, by an individual operating a vehicle titled in defendant's name.

2. That the original charge receipts were mailed on March 15, 1978, to the defendant's father at defendant's address.

3. This credit card and the original charge receipt "are material evidence in investigations of murder, robbery and felonious assault . . . on the 9th day of February 1978 in Greene County, Tennessee as suspect Russell Keith Berry has given alibi defense to affiant that he did not leave the Nashville, Tennessee area on date of said offense."

The affidavit does not set forth the fact that the gasoline purchase was made in Knoxville, Tennessee, on the date of the murder. The magistrate was not given this critical underlying fact. As a maximum, the affidavit suggests the fraudulent use of a gasoline credit card and contains a bald assertion that the named items are material. Beyond the fraudulent use of the credit card, the activities are innocuous, innocent and probative of nothing. The allegation of materiality is, of course, a mere conclusion.

In *Aguilar v. Texas, supra,* the Court said:

Although the reviewing court will pay substantial deference to judicial determinations of probable cause, the Court must still insist that the magistrate perform his "neutral and detached" function and not serve merely as a rubber stamp for the police.

378 U.S. at 111, 84 S.Ct. at 1512, 12 L.Ed.2d 727.

Further:

The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere *conclusion* \* \* \*. (Emphasis supplied).

378 U.S. at 112, 84 S.Ct. at 1513, 12 L.Ed.2d 727.

The Supreme Court of the United States took *Spinelli v. United States, supra,* "[b]elieving it desirable that the principles of *Aguilar* should be further explicated." 393 U.S. at 412, 89 S.Ct. at 587, 21 L.Ed.2d at 641. Spinelli was convicted of traveling in interstate commerce with the intention of conducting illegal gambling activities. The convicting evidence was obtained by means of a search warrant supported by an affidavit which alleged in substance:

1. On various days Spinelli had been seen crossing the bridge leading from Illinois into St. Louis, Missouri and had been seen parking his car at a St. Louis Apartment house. On one occasion he had been followed to a particular apartment.

2. The records of the Telephone Company revealed that the apartment contained two telephones with different numbers and listed in the name of a person other than the defendant.

3. Spinelli was known to affiant and law enforcement officials as a bookmaker and gambler.

4. A reliable person had informed that Spinelli was conducting a gambling operation by means of these two phones.

The Court summarily disposed of the first two items, stating that they "reflect only innocent seeming activity and data." 393 U.S. at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 642. With respect to the third item, that Spinelli was known as a gambler and associate of gamblers, the Court bluntly characterized this as being "but a bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision." 393 U.S. at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 643. The Court discredited the fourth item for want of proof of reliability and lack of a sufficient statement of the underlying circumstances.

The informant in the case at bar was named but the information he supplied, as set fourth in the warrant, was indicative of "innocent seeming activity and data." Agent Baird conceded at the suppression hearing that the mere fact of the use of the credit card does not operate to refute defendant's alibi. Yet he says that this use and the fact the credit card was "fraudulently obtained and invalid" was all he relied upon to support his "material evidence" charge. The statement that the credit card and charge slip are "material evidence" is but "a bald and unilluminating assertion of suspicion that is entitled to no weight." Clearly, the affidavit in the instant case is not as strong as the judicially condemned affidavit in Spinelli, which the Court could not sustain "without diluting important safeguards that assure that the judgment of a disinterested judicial official will interpose itself between the police and the citizenry." 393 U.S. at 419, 89 S.Ct. at 591, 21 L.Ed.2d at 645–46.

Our own case of Earls v. State, 496 S.W.2d 464, 465 (Tenn.1973), reminds us that in analyzing the validity of a search warrant, "[m]ere affirmance of belief of suspicion is not enough."

"The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the states through the Due Process Clause." Coolidge v. New Hampshire, supra. The demands of due process take on a broadened significance in death penalty cases, for death "is a different kind of punishment from any other which may be imposed in this country." Gardner v. Florida, 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed. 393, 401 (1977).

Looking at this record in a light most favorable to the prosecution, there was no need for the documents listed in the warrant; viewed from the other end of the spectrum the warrant was a ploy, a subterfuge and a pretext to intrude into the privacy of defendant's home. It is unnecessary to decide which and such a decision is of no consequence because the end result is the same. In either event the search warrant was defective. It was further defective because the affidavit did not give sufficient underlying information, with the result that it basically details innocent seeming activity, with its guilty cast resting upon unsupported conclusions and suspicion.

For these reasons I would hold that this search warrant was invalid under the Fourth Amendment to the Constitution of the United States and under Article I, Section 7 of the Constitution of Tennessee. In my opinion all fruits of the search were inadmissible and the Trial Judge erred in failing to sustain the motion to suppress.

## APPENDIX

### STATE OF TENNESSEE, DAVIDSON COUNTY SEARCH WARRANT

I, Bob Baird, make oath that I am an Agent of the Tennessee Bureau of Criminal Identification assigned to the Twentieth Judicial Circuit and that on the 30th day of March, 1978 I received information from Special Agent Bob Quinn, Exxon Company, P.O. Box 367, Memphis, Tennessee, that he personally reviewed the Exxon credit records and determined that on February 9, 1978 Exxon credit card 181–631–9519 was used to purchase gasoline and oil in the amount of $6.27 by individual operating vehicle bearing Tennessee registration 6A3458. Special Agent Bob Quinn further advised that Exxon credit card # 181–631–

9519 is assigned to Raymond Kenneth Berry, 180 Wallace Road, Apartment V–24, Nashville, Tennessee, and that above credit card was used in purchase of gasoline on February 11, 1978 by individual operating vehicle bearing Tennessee registration 6B4673. Special Agent Bob Quinn advised that original charge receipts were mailed on March 15, 1978 from Exxon Company to Raymond Kenneth Berry, 180 Wallace Road, Apartment V–24, Nashville, Tennessee. Affiant states that Russell Keith Berry is the son of Raymond Kenneth Berry and currently resides at 180 Wallace Road, Apartment V–24, Nashville, Tennessee and that account holder Raymond Kenneth Berry died on the *12th* day of *June 1976* at his home in Carter County, Tennessee as a result of gunshot wounds. Affiant further states that Tennessee vehicle registration 6A3458 is currently assigned to Russell Keith Berry, P.O. Box 1094, Johnson City, Tennessee and displayed on a 1976 Mercury Monarch VIN # 6W38F520120. That Tennessee vehicle registration 6B4673 is currently assigned to Sherry R. Shanks, 180 Wallace Road, Apartment V–24, Nashville, Tennessee and displayed on a 1974 Plymouth Duster VIN # VL29C4G276108. That Sherry R. Shanks is presently Sherry R. Berry due to marriage to Russell Kenneth Berry on the 17th day of December 1977. Affiant states that Exxon credit card # 181–631–9519 and original charge receipts are material evidence in investigation of murder, robbery and felonious assault of John and Zelma Shanks on the 9th day of February 1978 in Greene County, Tennessee as suspect Russell Keith Berry has given alibi to affiant that he did not leave Nashville, Tennessee area on date of said offense.

Affiant further states that Special Agent Bob Quinn, Exxon Company, advised him that original charge receipts for Exxon account # 181–631–9519 were mailed within the last 15 days to 180 Wallace Road, Apartment V–24, Nashville, Tennessee. The premises, person, and vehicles are described as follows, to wit: The person of suspect Russell Keith Berry, Apartment V–24, Nob Hill Villa, 180 Wallace Road, Nashville, Tennessee and said vehicles being a brown 1974 Plymouth Duster bearing Tennessee registration 6B4673 and a 1976 Mercury Monarch, black in color bearing Tennessee registration 6A3458.

Sworn to and subscribed before me this the *31* day of March, 1978.

s/ Bobby D. Baird
Bobby D. Baird, T.B.I.

    s/ A. A. Birch, Jr.
    A. A. BIRCH, JR.,
    Judge.