**STATE of Tennessee, Appellee,**

v.

**Willie SPARKS, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

March 2, 1987.

Rehearing Denied March 30, 1987.

Rodney C. Strong, Chattanooga, for appellant; Jessee O. Farr, of counsel.

W.J. Michael Cody, Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Frank M. Groves, Jerry S. Sloan, Asst. Dist. Attys. Gen., Nashville, for appellee.

OPINION

HARBISON, Justice.

Appellant was convicted of armed robbery and of murder in the first degree in the perpetration of armed robbery of Robert Boddie, a delivery man for the Athens Distributing Company, while the victim was on the premises of a retail liquor store in Chattanooga. In addition to the present offenses, the jury found (1) that appellant had been previously convicted of three other felonies which involved the use or threat of violence to the person and (2) that the instant murder was committed while appellant was engaged in committing robbery. Therefore it found aggravating circumstances which justified the imposition of the death penalty under the provisions of T.C.A. § 39–2–203(i)(2) and (7). The trial judge approved the verdict and sentence. We affirm.

On July 8, 1983, at about 3 p.m., Robert Boddie, a driver for Athens Distributing Company, a wholesale liquor dealer, was shot three times and killed while making a delivery at Daddy's Liquor Store on Glass Street in Chattanooga. A clerk at the liquor store saw Boddie lying on the ground and a black male standing beside the deliv-

ery truck going through a billfold. The clerk did not see a gun. When she shouted at the man, he fled on foot. She described him as having short hair, no beard and wearing a short-sleeved sports shirt and dark pants. At "about 4:00 p.m." on the same day, Desica Steele, who was visiting a friend about a block from the liquor store, saw a black man, about 5 feet 5 inches tall and weighing approximately 160 to 170 pounds, standing by a power pole near the liquor store, going through a wallet. This man had a gun in his pants and was wearing a blue t-shirt, cut-off faded jeans, blue sweat socks and tennis shoes. When this man saw the witness Steele, he ran in the direction opposite Daddy's Liquor Store. Steele testified that she had a good look at the man, but she was unable to identify anyone at trial as the person she had seen. Investigating police officers did not find a wallet on the deceased, although other testimony showed that he customarily carried one.

By early August, 1983, the investigation by police led to Michael Jones, Melvin Nichols and appellant Willie Sparks. The latter by then had left the state. Jones and Nichols cooperated with the police and were important trial witnesses. Jones permitted the police to tap his telephone.

On August 11 Detectives Angel and Stafford participated in and recorded a telephone call to the residence of Jones by a person identifying himself as appellant Sparks. Nichols and Jones testified that the caller was in fact the appellant.

In the course of that telephone conversation Nichols advised the caller that Sparks together with Nichols had been implicated in the Boddie murder by an informant. Nichols stated that a warrant had been issued for the arrest of both. He told the caller that he planned to leave Chattanooga to go to Atlanta. The caller stated that he was already in Atlanta, and the two arranged to meet there the next day at the bus station.

Appellant was at the bus station near the appointed time the next day and was arrested there by John Arthur, an officer of the Georgia Bureau of Investigation. Appellant gave a statement denying any knowledge of the Boddie murder and denying that he had spoken with Jones or Nichols since he had been in Atlanta.

Both Jones and Nichols were indicted for armed robbery and first degree murder as a result of Mr. Boddie's death. At the trial of appellant they testified to essentially the same facts. Their testimony was that on July 8 they went to a loan company where Nichols picked up a .38 caliber pistol that he had pawned for Jones a few days earlier. Later that day when Jones, Nichols and appellant went to sell some food stamps for Jones, Nichols met Lebron Griffin and referred him to appellant. After appellant spoke with Griffin, he asked Nichols to drive him to Glass Street and Jones to lend him his pistol. According to Nichols, appellant explained that a man with whom he had been speaking had told him he could make some extra money if he got an empty pistol and met him behind Daddy's liquor Store where they were "going to set up this rip-off." Nichols said that he thought that a "fake robbery" was planned. Jones testified that appellant told him something had been set up with the delivery man who was going to give them the money. Jones gave appellant the gun, which both he and Nichols said was unloaded.

Nichols then dropped Jones and appellant off on Glass Street and as he drove away he saw the appellant walking toward Daddy's Liquor Store. Jones testified that he went inside the liquor store for appellant to see if it was crowded. When he came out, he saw appellant standing beside the store.

When Nichols returned to Glass Street, he saw Jones who told him that something was "going on." However, Jones testified that he only told Nichols that he did not know where appellant Sparks was. About this time Sparks, who was shirtless and no longer had the pistol, came running down the street and got into Nichols' car. He told Nichols and Jones that it was "the wrong guy back there," that he had to shoot "the old guy" because "he started getting smart with me" and "jumped at me." When Jones asked why he did it,

appellant replied that "If he was going down, he wanted to go all the way." Sparks told Nichols that he had hidden the gun in a hole behind a church on Glass Street. The gun was introduced into evidence, and a firearms expert testified that a bullet removed from the victim's body had been fired from Jones' gun.

While appellant was in jail in Chattanooga, on August 25, 1983, he telephoned Jones and asked him to come for a visit. Jones informed the police of this telephone call, and Chattanooga Detective Stafford wired Jones for sound by placing a microphone on his person and instructed him to accept appellant's request for a visit so that their conversation could be intercepted through the microphone and could be heard by Detective Stafford while he remained hidden in a room next to the room used by Jones and Sparks for their conversation. He instructed Jones "to be normal and try not to talk any more than he had to, just to see what he wanted."

Jones testified that during this conversation appellant told him that things looked bad for him and that Nichols had set him up. Therefore he planned to have Nichols killed. Stafford also testified to the substance of this conversation which he overheard. He said that appellant had asked about the gun and threatened Nichols who had set him up at the bus station in Atlanta. He interpreted appellant's remarks as implying that nothing would have happened if Nichols had remained silent.

### A.  The Suppression Issue

█ As pointed out in the dissent, the most serious issue presented in this appeal is the denial of appellant's pre-trial motion to suppress evidence of his conversation with Jones in the jail at Chattanooga on August 25, 1983.

It should be noted that neither the taped interview nor a transcript of it was introduced into evidence. There was nothing more than a brief summary of it elicited from Jones and Stafford. Their testimony contained nothing which had not already been clearly established by other evidence.

The interview led to the discovery of no new evidence.

More than a week before this conversation at the jail occurred, Stafford had obtained the murder weapon from one Lebron Griffin. Both Nichols and Jones, in their testimony, identified Griffin as the individual who suggested that appellant participate in the homicide. The testimony of Nichols and Jones that they redeemed this weapon from pawn shop on the date of the homicide, July 8, 1983, was corroborated by documentary evidence from the pawn shop.

Nichols testified that after the homicide, appellant gave him the pistol. It was again placed in pawn, and a ticket showing its withdrawal on August 5, 1983, was likewise introduced into evidence.

Before the conversation between Jones and appellant occurred in the jail on August 25, 1983, the weapon had been subjected to a ballistics test by Georgia police officials and confirmed to be the one from which the fatal shots had been fired.

Appellant insists that there was a violation of his right to counsel when police authorities arranged for or sanctioned the contact between him and Jones. Appellant relies upon *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) and similar cases in which uncounselled statements made to undercover agents have been held to contravene the Sixth Amendment. *See also* *State v. Berry,* 592 S.W.2d 553 (Tenn.1980) and *State v. Webb,* 625 S.W.2d 281 (Tenn. Crim.App.1980) and cases cited therein.

In the present case the jail statements of appellant testified to at trial were cumulative and their contents had already been proved by other evidence which was overwhelming.

In our opinion if any error occurred in their admission under the circumstances of this case, it was harmless beyond a reasonable doubt and could not have affected the verdict or the sentence.

## B.  *Corroboration*

Appellant insists that if the evidence concerning his statements at the jail had been excluded, then there remained insufficient independent evidence to corroborate the testimony of Jones and Nichols, who, he asserts, were accomplices as a matter of law.

We have already outlined the evidence given by Detective Stafford, as well as by Jones and Nichols, concerning the telephone conversation made by appellant to the residence of Jones on August 11, 1983. As stated, during that conversation Nichols arranged to meet the caller at the Atlanta bus station the next day.  Appellant was there as agreed and was arrested by Officer Arthur, who was a witness at the trial.

The testimony of this officer, if accepted by the triers of fact, clearly confirmed the testimony of Nichols, Jones and Stafford that the telephone caller on August 11, 1983, was in fact appellant and that appellant had arranged to meet Nichols at the bus station, with full knowledge that both were the subject of an arrest warrant for the homicide out of which the present case arose.

Appellant cites and relies upon the case of *McKinney v. State*, 552 S.W.2d 787 (Tenn.Crim.App.1977), for the rule that independent evidence is necessary to corroborate the testimony of an accomplice. This rule is well settled in Tennessee, but in the *McKinney* case, *supra*, as well as in numerous other cases, the following principles were stated:

> "The corroborative evidence may be direct or circumstantial.  It need not be, of itself, sufficient to support a conviction. If the corroborating evidence fairly and legitimately tends to connect the accused with the commission of the crime charged, it satisfies the requirement of the rule on corroboration of the accomplice's testimony.  *Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811 (1959).  Slight circumstances may be sufficient to furnish the necessary corroboration of an accomplice's testimony.  *Garton v. State*, 206 Tenn. 79, 332 S.W.2d 169 (1960).  The question of corroboration of

an accomplice's testimony is for the jury to determine.  *Clapp v. State*, 94 Tenn. 186, 30 S.W. 214 (1895).  The jury may look at all the evidence in the case and draw reasonable inferences therefrom." 552 S.W.2d at 789.

■ In our opinion the testimony of Nichols and Jones was clearly corroborated by the independent testimony of both officers Stafford and Arthur, wholly apart from the jail conversation recorded on August 25.  In addition to their testimony, it was established by the testimony of Vivian Eberhardt, the aunt of Michael Jones, that the three men, Jones, Nichols and appellant, were together on the morning of the homicide and that in fact they picked her and another person up in an automobile a short time before the homicide occurred.

■ The testimony of Nichols and Jones, if accepted by the jury, overwhelmingly established the guilt of appellant. The homicide was a deliberate shooting in the course of a planned robbery.  Appellant did not testify or offer any evidence at either the guilt phase of the trial or at the sentencing hearing.  The jurors were, in our opinion, clearly warranted in convicting him of felony murder and in imposing the death penalty.  The sentence is not disproportionate to that approved in numerous other felony murders.  *See, e.g., State v. Laney*, 654 S.W.2d 383 (Tenn.1983), *cert. denied* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983); *Houston v. State*, 593 S.W.2d 267 (Tenn.1980), *cert. denied* 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980).

All of the other issues raised by counsel for appellant have been previously considered by the Court and in our opinion do not warrant reversal of the judgment or the sentence.  The sentence will be carried out as provided by law on July 15, 1987 unless stayed by order of this Court or other proper authority.  All costs are assessed to appellant.

COOPER and DROWOTA, JJ., concur.

BROCK, C.J., files dissent in which FONES, J., concurs.

BROCK and FONES, Justices, dissenting.

We respectfully dissent.

On July 8, 1983, at about 3:00 p.m., Robert Boddie, a driver for Athens Distributing Company, a wholesale liquor dealer, was shot three times and killed while making a delivery at Daddy's Liquor Store on Glass Street in Chattanooga. A clerk at the liquor store saw Boddie lying on the ground and a black male standing beside the delivery truck going through a billfold. The clerk did not see a gun and when she shouted at the man, he fled on foot. She described him as having short hair, no beard and that he wore a short-sleeved sports shirt and dark pants. The State's evidence also showed that at "about 4:00 p.m." on the same day, Desica Steele, who was visiting a friend about a block from the liquor store saw a black man, about 5 ft. 5 in. tall and weighing approximately 160 to 170 lbs. standing by a power pole near the liquor store, going through a wallet. This man had a gun in his pants and was wearing a blue t-shirt, cut-off faded jeans, blue sweat socks and tennis shoes. When this man saw the witness Steele he ran in the direction opposite Daddy's Liquor Store. Steele testified that she had a good look at the man, but was unable to identify anyone in the courtroom as the man she had seen. Investigating police officers did not find a wallet on the deceased, although other testimony showed that he customarily carried one.

The investigation by the police led on August 11, 1983, to Michael Jones, Melvin Nichols and the defendant Willie Sparks, who by then had left the state. Jones and Nichols decided to cooperate with the police in the investigation. Jones allowed the police to tap his telephone and Nichols tricked the defendant into believing he would meet the defendant at the Atlanta Bus Station the next morning. Accordingly, on August 12, 1983, the defendant was arrested in Atlanta, Georgia, when he came to the bus station to see Nichols. The defendant gave a statement denying any knowledge of Mr. Boddie's murder and robbery and falsely claimed that he had not spoken with Jones or Nichols since he had been in Atlanta.

Both Jones and Nichols were indicted for armed robbery and first degree murder as a result of Mr. Boddie's death but both testified on behalf of the State at the defendant's trial to basically the same facts. The scenario revealed by their testimony was that on July 8 they went to a loan company where Nichols picked up a .38 caliber pistol that he had pawned for Jones a couple of days earlier. Later that day when Jones, Nichols and the defendant went to sell some food stamps for Jones, Nichols met Lebron Griffin and referred him to the defendant. After the defendant spoke with Griffin, he asked Nichols to drive him to Glass Street and Jones to lend him his pistol. According to Nichols, the defendant explained that a man with whom he had been speaking had told him he could make some extra money if he got an empty pistol and met him behind Daddy's Liquor Store where "we going to set up this rip-off." Nichols said that he thought that a "fake robbery" was planned. Jones testified that the defendant told him something had been set up with the delivery man who was going to give them the money. Jones gave the defendant the gun, which both he and Nichols said was unloaded.

Nichols then dropped Jones and the defendant off on Glass Street and as he drove away he saw the defendant heading toward Daddy's Liquor Store. Jones testified that he went inside the liquor store for the defendant to see if it was crowded. When he came out, he saw the defendant standing beside the store.

When Nichols returned to Glass Street, he saw Jones, who told him, "Something going on, man." However, Jones testified that he only told Nichols that he didn't know where the defendant was. About this time the defendant, who was shirtless and no longer had the pistol, came running down the street and got into Nichols car. The defendant told Nichols and Jones that it was "the wrong guy back there," that he had to shoot "the old guy" because "he started getting smart with me" and "jumped at me." When Jones asked why

he did it, the defendant replied that "If he was going down, he wanted to go all the way." The defendant told Nichols that he had hidden the gun in a hole behind a church on Glass Street. The gun was introduced into evidence and a firearms expert testified that a bullet removed from the victim's body had been fired from Jones' gun.

While the defendant was in jail in Chattanooga he telephoned Jones and asked him to come and visit him. Jones informed the police of this telephone call and Chattanooga Detective Stafford wired Jones for sound by placing a microphone on his person and instructed him to accept the defendant's request for a visit so that their conversation could be intercepted through the microphone and could be heard by Detective Stafford while he remained hidden in a room next to the room used by Jones and the defendant for their conversation.

Jones testified that during this conversation the defendant told him that things looked bad for him and that Nichols had set him up so he was going to have Nichols killed. Detective Stafford also testified to the substance of this conversation which he overheard, about how the defendant had asked about the gun and threatened Nichols who he believed had set him up at the bus station in Atlanta. He interpreted defendant's remarks as implying that nothing would have happened if Nichols had kept his mouth shut.

Perhaps the most serious issue urged by the defendant upon this appeal is that the court erred in denying his pre-trial motion to suppress evidence of his conversation with Jones in the jail at Chattanooga on August 25, 1983, which was recorded by Detective Stafford from a microphone placed on the person of Jones by the detective. The issue, of course, is whether the defendant's Sixth Amendment right to counsel was violated and, if so, whether the error in admitting the conversation into evidence was prejudicial.

It is well settled that the right to counsel in a criminal proceeding attaches under the Sixth Amendment to the United States Constitution as soon as adversary proceedings are commenced against an individual; from that moment on he is entitled to the right of legal representation when the government through any of its agents attempts to interrogate him. *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *Kuhlmann v. Wilson*, —— U.S. ——, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *State v. Mitchell*, Tenn., 593 S.W.2d 280, 296 (1980).

In *Maine, supra,* the Court explained: "As indicated in the last sentence of this paragraph, the Court has also recognized that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself. Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, 'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.' (Citations omitted.) And, '[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time the judicial proceedings have been initiated against him....' *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). This is because, after the initiation of adversary criminal proceedings, 'the government has committed itself to prosecute and ... the adverse positions of government and defendant have solidified. It is then that the defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " (Citation omitted.) *Maine v. Moulton*, 106 S.Ct. at 484.

In *State v. Mitchell, supra,* this Court recognized that a defendant's Sixth Amendment right to counsel existed at the time of a lineup identification, noting that formal arrest or charge had marked the commencement of that prosecution. 593 S.W.2d at 286.

Although the record on this issue is somewhat sketchy we are satisfied it shows that adversary judicial proceedings had begun at the time the State wired Jones for sound and eavesdropped upon his conversation with the defendant in the Hamilton County jail. The defendant had been arrested in Atlanta 13 days earlier on August 12, 1983, and brought to Chattanooga where he remained in jail at the time of the conversation on August 25, 1983. We note that Rule 5, Tennessee Rules of Criminal Procedure, was in effect and controlled the situation at that time. Pertinent portions of that rule are:

"Rule 5. *Initial Appearance Before Magistrate.*—(a) Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5. If a person arrested without a warrant is brought before a magistrate an affidavit of complaint shall be filed forthwith. When an arrested person appears initially before a magistrate, the magistrate shall proceed in accordance with this rule.

\*       \*       \*       \*       \*       \*

(d) *Felonies.* If the offense charged is a felony, the defendant shall not be called upon to plead. The magistrate shall inform the defendant of:

(1) the charge and the contents of the affidavit of complaint,

(2) the right to counsel,

(3) the right to appointed counsel if indigent,

(4) the right to remain silent and give no statement,

(5) the fact that any statement given voluntarily may be used against the defendant,

(6) the general circumstances under which the defendant may obtain pretrial release, and

(7) the right to a preliminary examination.

If the defendant waives preliminary examination, the magistrate shall forthwith bind him over to the grand jury. If the defendant does not waive preliminary examination, the magistrate shall set a preliminary examination within ten days if the defendant remains in custody, and within thirty days if released under applicable law." Rule 5, Tennessee Rules of Criminal Procedure.

At trial Detective Stafford was asked whether "all this took place after you had already been to city court and the matter had been bound over to the (sic) preliminary hearing." Detective Stafford answered in the affirmative. Moreover, the transcript of the secretly recorded conversation itself contained the following statements:

"Jones: So what they do in court Friday man?[1]

"Sparks: They just waived the preliminary hearing and they made him [Nichols?] and they had him [Nichols] up there running off at the mouth.

\*       \*       \*       \*       \*       \*

I didn't get a chance to see him. The dude I representing [?] said, he wouldn't recommend that I take the stand. You know it looked that bad.

\*       \*       \*       \*       \*       \*

"Sparks: Yeah, if I had a real good lawyer, I could beat this case, but I ain't got no lawyer. The lawyer I talked to wanted $15,000, but I ain't got no $15,000."

There being no indication to the contrary, we assume that local officials performed their duties as prescribed by Rule 5, Tennessee Rules of Criminal Procedure. Thus,

1. This conversation itself occurred on August 25, 1983, and the next previous Friday was August 19, 1983, obviously the date of the hearing in city court.

we are satisfied that the hearing referred to by Detective Stafford and by the defendant Sparks was the "Initial Appearance Before Magistrate" as required and prescribed by Rule 5, Tennessee Rules of Criminal Procedure. In our view this hearing marked the commencement of adversary judicial proceedings in this case, entitling the defendant to his Sixth Amendment right of counsel. We do not understand that the majority holds otherwise.

Once the right of the defendant to the assistance of counsel had attached, it was incumbent upon the State to honor it. "This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes upon the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance." Justice Brennan, in *Maine v. Moulton, supra,* at 106 S.Ct. 484.

Did the State violate the defendant's right to assistance of counsel in this instance? Did the State "intentionally create a situation likely to induce [the defendant] to make incriminating statements?" *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980).

The defendant initiated the contact with Jones by telephoning him and asking that he visit defendant at the jail. Jones sought the advice of Detective Stafford with whom he had agreed to cooperate, and Stafford asked if he would be willing to wear a microphone connected to a tape recorder while he was talking with the defendant, to which Jones agreed. Detective Stafford instructed Jones "to be normal and try not to talk any more than he had too, just to see what he wanted." But, the ensuing conversation was recorded and overheard by police officers.

In other cases the introduction into evidence of conversations secretly intercepted in a similar manner by informants or undercover agents has been condemned. In *Massiah, supra,* Massiah's co-defendant, who was surreptitiously cooperating with State authorities upon instructions of the government, invited Massiah to discuss the pending case in his car, which the government had outfitted with a radio transmitter. The evidence thus gained was held to be inadmissible.

In *State v. Berry, supra,* this Court condemned the use of an interrogation when T.B.I. undercover agents were placed in jail with the defendant and held extended conversations with him. Also in *State v. Webb,* Tenn.Crim.App., 625 S.W.2d 281, 283–84 (1980), in which an undercover agent was placed in the same jail as the defendant and his co-defendant the Court held that the substance of a conversation between the defendant and co-defendant was illegally obtained.

In *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980) the Court found that Henry's right to counsel had been violated when police told a paid informant confined to jail with Henry to be alert to any statement made by "Federal prisoners" but not to initiate any conversation with Henry or question him regarding the crime. Factors deemed to be important by the Court were (1) the informant was acting under instructions as an informer, (2) that the defendant was not aware of the informant's true role as an informer and knew him only as a fellow inmate and (3) that the defendant was in custody under indictment when he spoke with the informant. Significantly, the Court was of the opinion that it did not matter that the defendant first mentioned the subject of the crime under investigation.

We quote from the opinion in *Maine v. Moulton, supra,* as follows:

"The Government [in *United States v. Henry, supra* ] argued that it should not be held responsible for Nichols' conduct because its agent had instructed Nichols not to question Henry and had not intended that Nichols take affirmative steps to obtain incriminating statements. We rejected this argument, finding that, under the circumstances, the agent 'must have known' that Nichols would take affirmative steps to secure incriminating information. *Id.* at 271, 100 S.Ct., at 2187. Consequently, the court held, '[b]y intentionally creating a situation likely to

induce Henry to make incriminating statements without the assistance of counsel the Government violated Henry's Sixth Amendment right to counsel.' *Id.* at 274, 100 S.Ct., at 2189." 106 S.Ct. at 486.

In the instant case it is argued that there is no violation of defendant's right to counsel because the defendant himself called for the visit by Jones, thus initiating the conversation. In disposing of a similar argument in *Maine v. Moulton, supra,* the Supreme Court said:

"In the first place, the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decision in *Massiah* or *Henry.* Thus, while in *Massiah* it may have been the Government's agent who was responsible for setting up the meeting with the defendant, one discovers this only by looking to the opinions of the Court of Appeals. It is not mentioned in this Court's opinion since the issue of who set up the meeting with whom was not pertinent to our disposition. Moreover, four years after *Massiah* the court summarily reversed a conviction where the defendant requested the meeting and initiated and led the conversation in which incriminating statements were made to an undercover informant. *Beatty v. United States,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) *(per curiam).* In that case, the Solicitor General made the same argument that he and the State make today, see Brief in Opposition, *Beatty v. United States,* O.T. 1967, No. 338, pp. 5–8; we rejected this argument in an opinion that simply cited *Massiah.* Finally, in *Henry,* we deemed it 'irrelevant that in *Massiah* the agent had to arrange the meeting between Massiah and his co-defendant where here the agents were fortunate enough to have an undercover informant already in close proximity to the accused.' 447 U.S. at 272, n. 10, 100 S.Ct. at 2187, n. 10. Beyond this, the State's attempt to limit our holdings in *Massiah* and *Henry* fundamentally misunderstands the nature of the right we recognized in those cases.

The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. *See Henry,* 447 U.S., at 276, 100 S.Ct., at 2189 (Powell, J., concurring). However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

"Applying this principle to the case at hand, it is clear that the State violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant, Colson. It was the police who suggested to Colson that he record his telephone conversations with Moulton. Having learned from these recordings that Moulton and Colson were going to meet, the police asked Colson to let them put a body wire transmitter on him to record what was said. Police Chief Keating admitted that, when they made this request, the police knew—as they must have known from the recorded telephone conversations—that Moulton and Colson were meeting for the express purpose of discussing the pending charges and planning a defense for the trial. The police

thus knew that Moulton would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel. As in *Henry* the fact that the police were 'fortunate enough to have an undercover agent already in close proximity to the accused' does not excuse their conduct under these circumstances. (Citations omitted.) By concealing the fact that Colson was an agent of the State, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment." 106 S.Ct. at 486–88.

Applying the interpretation and construction of the Sixth Amendment right to counsel as set out in the foregoing authorities, we would hold that in the instant case the defendant's right to counsel was violated.

Moreover, this conversation between Jones and the defendant was incriminating and injurious to the defendant in this case. At two or three places in the conversation Jones asked the defendant whether or not Nichols "saw him do it" to which the defendant replied: "There is no way he could have;" and, in at least one instance, the defendant's reply was: "He didn't see me do it." At another point in the conversation the defendant asked Jones if Nichols told the police that all three of them rode over to the scene of the crime together. Defendant also asked Jones in the conversation what Nichols had done with the "piece", clearly referring to the pistol with which the murder was committed. At several points in the conversation the defendant and Jones discussed whether or not the defendant should "tell everything" to the police in the hopes of getting lighter punishment. At another point in the conversation, the defendant, noting that Nichols was the only one who had not been jailed for this offense, stated "He did about as much as I did."

Neither the tape of the Jones-defendant conversation in jail nor the transcript thereof was introduced into evidence before the jury, although they were made exhibits in the record for identification only, but the substance of the conversation was placed before the jury through the testimony of Jones and Detective Stafford. Moreover, the defendant duly filed a pre-trial motion to suppress the State's evidence of the conversation on the ground that it was obtained in violation of the defendant's Sixth Amendment right to counsel and the court overruled the motion and held that the evidence was admissible. The defendant excepted and contends before us that the order of the court failing to suppress this evidence was prejudicial error.

We are unable to conclude, as held by the majority, that the error of the trial court in overruling the defendant's motion to suppress evidence of the jailhouse conversation and in admitting into evidence testimony of the substance thereof through the witnesses Jones and Stafford was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Clearly, the State's case is stronger with the wrongfully obtained conversation in evidence than it is without such evidence.

On the whole, the conversation, especially the statements of the defendant, constitute significant corroboration of the testimony of co-defendants Jones and Nichols at the trial. Indeed, without it there is no corroboration of the testimony of Nichols and Jones; neither of the "eyewitnesses" identified the defendant as the man seen near the shooting with a gun or the deceased's wallet in his hand. The majority relies upon the murder weapon as corroboration, but that cannot be true because there is nothing to connect the defendant to that weapon but the testimony of Jones and Nichols, his accomplices. In our opinion this error was prejudicial and requires reversal and a new trial.

We would reverse and remand for a new trial.

FONES, J., joins in dissenting opinion.