IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 23, 2007

**STATE OF TENNESSEE v. KLEIN ADLEI RAWLINS**

**Appeal as of Right from the Criminal Court for Sumner County**
**No. 180-2002   Jane Wheatcraft, Judge**

---

**No. M2006-01059-CCA-R3-CD - Filed April 20, 2007**

---

The Defendant, Klein Adlei Rawlins, was convicted by a Sumner County jury of aggravated child abuse and first degree felony murder. On appeal, he alleges that: (1) his right to counsel was violated during police questioning in jail; (2) the trial court erred when it allowed autopsy photographs of the victim into evidence; (3) the trial court erred when it allowed an unqualified witness to give expert testimony; and (4) the evidence was insufficient to sustain his convictions. Because we conclude that no reversible error exists, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

David R. Howard, Gallatin, Tennessee, for the Appellant, Klein Adlei Rawlins.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; Sallie Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I.  Facts**

This case arises from the death of a two-year-old victim by asphyxiation. The Defendant was charged with aggravated child abuse and first degree felony murder. At his trial on these charges, the following evidence was presented:

Donnie Wilkinson, with the City of Portland Fire Department, testified that he received a dispatch call instructing him to go to a residence where a child was not breathing but was receiving C.P.R. When he arrived at the residence, no one was performing C.P.R. on the child, and the child's mother was hysterical. Wilkinson began to perform C.P.R. but was unable to obtain an open airway because the child's body was in a state of rigor mortis. Wilkinson knew that the child had died but

continued to perform C.P.R. because the child's mother was upset. Wilkinson saw a man at the residence, who he presumed was the victim's father, and noted that the man seemed pretty calm.

Ray Hall testified that he also responded to this call as an employee with the Sumner County Emergency Medical Services (EMS). He saw the victim's mother crying on the couch and two EMS personnel performing C.P.R. on the victim. He tried to detect the victim's pulse, found none, and then noticed that the victim was in a state of rigor mortis. Consequently, he discontinued the C.P.R. because when rigor mortis is present reviving the victim is impossible. He told the victim's mother that the victim had died. The Defendant, whom Hall presumed was the victim's father, sat in the living room and was visibly upset.

Melvin McLerran, a lieutenant with the Portland Police Department, responded to a dispatch call, arrived at the victim's residence, and spoke with the Defendant. The Defendant told Lieutenant McLerran that the victim's mother woke the Defendant and told him that the victim was not breathing. The Defendant then described how he performed C.P.R. on the victim.

Tracy Kizer, an administrative assistant with the Portland Police Department, described how 911 calls are received and transferred to emergency personnel. Beverly Pardue, the Sumner County EMS dispatch supervisor, described how dispatch calls are recorded, and a recording of the 911 phone call made by the victim's mother was played before the jury. During this phone call the victim's mother said that her two year-old daughter was not breathing but was warm to the touch and that someone was performing C.P.R. on her daughter.

Katisha Bratton testified that she is the victim's mother and that she lived with the Defendant, who was unemployed at the time and who was her son's father. She explained that the victim had been potty trained but still had accidents at night, and the Defendant got mad because Bratton did not discipline the victim when the victim had accidents. Bratton had surgery a week before the victim's death, and the hospital prescribed hydrocodone for pain.

Bratton said that, the night preceding the victim's death, the victim fell asleep next to Bratton on the couch around 9:00 or 10:00 p.m. Bratton did not let the victim sleep with her on the couch because the victim had accidents, which angered the Defendant. Consequently, Bratton put the victim to bed in a different bedroom. The victim went into the Defendant's bedroom and woke him up, and Bratton woke up when she heard the Defendant screaming. The Defendant told Bratton to come get this "fu*king kid." Bratton retrieved the victim from the Defendant's bedroom and put the victim to bed. She argued with the Defendant. She took a hydrocodone while she was arguing with the Defendant because she got tired of listening to him, and the hydrocodone put her to sleep.

At 10:00 a.m. the next morning, Bratton went into the victim's bedroom and tickled the bottom of the victim's feet to wake her up. She picked up the victim, realized that the victim was stiff, got the Defendant, and he started to perform C.P.R. on the victim. Bratton called 911. The Defendant told her not to make that phone call because he did not need "this sh*t." After Bratton called 911, the Defendant told her that the victim was warm and that the victim had a pulse, and she

relayed this information to emergency personnel.

On cross-examination, Bratton acknowledged that neither she nor the Defendant had a job, that the time period preceding the victim's death was stressful, and that she was having difficulty dealing with stress. Bratton asserted that she was aware of her surroundings on the night of the victim's death even though she had taken a hydrocodone, which dulled her senses. She denied drinking any alcohol. She acknowledged that detectives asked her about dried feces found on the floor in the victim's bedroom, but she could not recall why the feces was there. She explained that the victim had had a bowel movement during the night, and, when she found the victim the next morning, she removed the victim's clothing.

Bratton acknowledged that, after the victim died, someone reported that Bratton had overdosed on her hydrocodone prescription, and an ambulance came and took her to a hospital. Bratton told hospital personnel that she had not overdosed on her medication, and the hospital personnel released her. She testified that she overheard police officers say that she was schizophrenic, and this angered her. She called the police department about several things that made her angry and "lashed out" at whomever answered the phone. Bratton denied having a problem with anger or any other mental health issues. Bratton acknowledged that the Defendant did not get along with the victim's father and her relatives, and she acknowledged that perhaps the Defendant chose not to attend the victim's funeral in order to ensure that the funeral was peaceful.

Thomas Deering, M.D., an expert in the field of forensic evidence, testified that he performed an autopsy on the victim. During this autopsy, he found blood in the victim's abdominal cavity and bruises on the victim's internal organs, which are indicative of trauma or abuse. Dr. Deering described various aspects of the victim's medical condition that suggested she died from strangulation. He also described various photographs of internal bruises located in the victim's neck, which suggested that someone placed hands on the victim's throat. The doctor opined that all of the victim's internal bruises occurred prior to her death. Dr. Deering then identified a picture of the victim's back and identified multiple bruises and contusions, explaining that these bruises occurred before the victim's death and indicated that the victim was possibly thrown and landed against a wall. Dr. Deering noted that the victim was in rigor mortis when he examined her, making her body stiff. The doctor said that it was not possible to detect a pulse in an individual's body that was in a state of rigor mortis. Further, finding an airway through which to perform C.P.R. on an individual in this state would be extremely difficult.

Anthony Reece Green testified as a field paramedic with Sumner County EMS about the responses that a child's body would have to asphyxiation. He testified that when an individual's life functions cease, the individual is likely to defecate because smooth muscles relax when an individual dies. On cross-examination, Green acknowledged that an individual could have a bowel movement prior to his or her death and then not defecate again after the life's functions cease.

Jeanie Cole testified as an employee with the Department of Children's Services and explained that she and Lieutenant Stan Jones went to the victim's residence the day after the victim

died. The Defendant answered the door but did not allow them to enter the residence. He got into a car with Detective Jones and Cole and agreed to help them locate the victim's mother. He told Cole that he felt guilty about what happened to the victim. He explained that the victim had awakened him in the middle of the night, and he screamed at her while she was shaking and crying. He told Cole that he found the victim the next morning and asked Cole if his C.P.R. performance could cause the victim to bruise. On cross-examination, Cole acknowledged that the Defendant showed concern for the victim's mother.

Karen Johnson testified that she lived near the victim and that she saw the Defendant shortly after the victim died. She asked him what happened to the victim, and he refused to discuss the victim's death. Johnson testified that she never saw the Defendant with the victim unless the victim's mother was with them. She later spoke with the Defendant, and he told her that he was very tired and confused the night the victim died. He explained that the victim's mother had fallen asleep and that the victim kept coming into his room and awakening him. He told the victim to go wake up her mother, but the victim just kept crying. The Defendant told Johnson that he spanked the victim.

Lieutenant Stan Jones testified that he arrived at the victim's residence after emergency personnel determined that the victim had died. He photographed the crime scene. He interviewed the Defendant twice; once the day after the victim died and then again a month after the victim died. He provided the Defendant with Miranda warnings prior to each interview. During the initial interview, the Defendant told Lieutenant Jones that the victim came into his room around midnight, and he sent the victim to her mother. The Defendant said that the next morning the victim's mother awoke screaming because the victim was not breathing, and he described how he performed C.P.R. on the victim. During the interview that occurred a month after the victim died and the autopsy had revealed that someone had suffocated the victim, Lieutenant Jones asked the Defendant if he abused and suffocated the victim, and the Defendant denied these accusations.

Lieutenant Jones explained that police officers arrested the Defendant for the victim's murder on account of the Defendant's inconsistent statements and the lies he told when the victim's mother called 911. He also found the Defendant's description of how he performed C.P.R. on the victim to be suspicious. In contrast, the victim's mother, the only other adult in the home at the time of the victim's death, provided police officers with consistent statements and looked them in the eye when she spoke with them.

Lieutenant Jones testified that he spoke with the Defendant a third time, after the Defendant had been arrested and placed in jail. From his jail cell, the Defendant requested to speak with Lieutenant Jones. Lieutenant Jones met with the Defendant, and, during this interview, the Defendant stated that he had been awake for four to five days prior to this incident and had no money. The Defendant told him that he was under a great amount of stress living without a job and trying to take care of his family. The Defendant then admitted that he had been deceptive to Lieutenant Jones throughout the course of the investigation. Lieutenant Jones testified that both the Defendant and the victim's mother had said that they argued until 2:00 a.m. on the night the victim

died.

On cross-examination, Lieutenant Jones acknowledged earlier stating that the victim's mother had lied during investigative interviews but stated that the victim's mother generally provided police officers with consistent statements. Lieutenant Jones agreed that, when he spoke with the Defendant in jail, he had finished investigating the crime and concluded that the Defendant killed the victim. He also acknowledged that he used investigative tactics in hope to gather information during this interview.

Based upon this evidence, the jury convicted the Defendant of aggravated child abuse and first degree felony murder.

## II. Analysis

On appeal, the Defendant alleges that: (1) his right to counsel was violated during a police interrogation in jail; (2) the trial court erred when it allowed autopsy photographs of the victim into evidence; (3) the trial court erred when it allowed an unqualified witness to testify as an expert; and (4) the evidence was insufficient to sustain his convictions.

### A. Right to Counsel

The Defendant alleges that the trial court erred when it allowed Lieutenant Jones to testify about a conversation that he had with the Defendant without the presence of an attorney, after the Defendant had been indicted and was represented by counsel. The State counters that the trial court properly admitted the Defendant's statement into evidence. The State also contends that the Defendant waived this argument because he failed to object contemporaneously when testimony about the Defendant's statement was entered into evidence. The trial court denied the Defendant's pre-trial motion to suppress this statement, concluding that the Defendant failed to prove that he was represented by counsel and that the Defendant made a knowing and intelligent waiver of his Sixth Amendment right to counsel when he initiated contact with Lieutenant Jones and spoke with him after receiving Miranda warnings.

Lieutenant Jones testified that someone at the District Attorney's office contacted him to inform him that the Defendant wished to speak with him. Lieutenant Jones asked if the Defendant was represented by counsel, and the District Attorney's office advised Lieutenant Jones that the Defendant did not have an attorney at the present stage in the case and that Lieutenant Jones could speak with the Defendant. Lieutenant Jones could not recall if he spoke with the prosecutor assigned to the Defendant's case or to another individual. When Lieutenant Jones went to speak with the Defendant, the Defendant initially complained that he had no phone privileges, and he could speak only with his attorney, Pam Beck with the Public Defender's Office. In his brief, the Defendant acknowledges that he did not specifically request to have counsel present during his conversation with Lieutenant Jones. Lieutenant Jones testified that he advised the Defendant of his rights and then continued speaking with the Defendant.

The Defendant risks waiver because he failed to object contemporaneously when the statement at issue was entered into evidence. Defense counsel's better course of action would have been to object to the admission of the Defendant's statement as it was entered into evidence. See Tenn. R. Evid. 103(a)(1). However, because the Defendant raised this issue in a pretrial motion, which the trial court denied, we will consider this issue on its merits.

The Sixth Amendment to the United States Constitution and Article 1, section 9 of the Tennessee Constitution guarantee that, in all criminal prosecution, the accused shall enjoy the right to have the assistance of counsel for his defense. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The Sixth Amendment right to counsel attaches to all critical stages of the prosecution. Hartman v. State, 896 S.W.2d 94, 99 (Tenn. 1995); Brewer v. Williams, 430 U.S. 387, 401 (1977). The right to counsel guaranteed by the Sixth Amendment and by Article I, section 9 attaches at the time the State initiates adversarial judicial proceedings against the defendant. State v. Rollins, 188 S.W.3d 553, 565-66 (Tenn. 2006). In Tennessee, the adversarial judicial process is initiated when formal charges are filed–i.e., an arrest warrant issues or an indictment or presentment is returned. Id. at 566. The Defendant in this case was indicted on March 7, 2002, and his Sixth Amendment right to counsel attached on that date. The fact that the Defendant had a right to counsel at the time of his interview with Lieutenant Jones does not necessarily mean that the interview violated his Sixth Amendment right.

The Sixth Amendment guarantees the accused the right to rely on counsel as a "medium" between the accused and the State following the initiation of formal charges. Massiah v. United States, 377 U.S. 201, 204 (1964). "[T]he clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Brewer, 430 U.S at 401. In order to find a Massiah violation, a court must first determine: (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of Massiah. State v. Bush, 942 S.W.2d 489, 513 (Tenn. 1997).

Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005) (quoting Rhode Island v. Ignis, 446 U.S. 291, 301 (1980)). "An undisclosed government agent may effectively 'interrogate' a defendant by simply engaging the defendant in general conversation . . . ." State v. Berry, 592 S.W.2d 553, 561 (Tenn. 1980). Interrogation also includes any "practice that the police should know is likely to evoke an incriminating response from a suspect." Sawyer, 156 S.W.3d at 534. The definition of interrogation focuses primarily upon the accused's perception rather than on the police officer's intent. Id. However, the officer's intent may be relevant to determine whether the officer should have known his or her words or actions were reasonably likely to invoke an incriminating response. Sawyer, 156 S.W.3d at 534.

Even if the aforementioned elements are met, a Defendant may waive his right to counsel.

-6-

The United States Supreme Court has noted that, "As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in Miranda has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." Patterson v. Illinois, 487 U.S. 285, 286 (1988). "Miranda warnings effectively convey to a defendant his right to have counsel present during questioning and also adequately inform a defendant of 'the ultimate adverse consequence' of making uncounseled admissions, i.e., that his statements may be used against him in any ensuing criminal proceeding." State v. Rollins, 188 S.W.3d 553, 567 (Tenn. 2006). In State v. Hinton, 42 S.W.3d 113, 125 (Tenn. Crim. App. 2000), this Court provided the following explanation of why a defendant's waiver of Miranda rights should also constitute a knowing waiver of his Sixth Amendment right to counsel:

> Miranda warnings sufficiently apprise defendants of their Fifth Amendment right to remain silent. In addition, the United States Supreme Court has held that Miranda warnings sufficiently inform defendants of their Sixth Amendment right to counsel such that a subsequent waiver is knowing. Patterson v. Illinois, 487 U.S. 285, 293-94, (1988). The Court determined that by "telling [the Defendant] that he had a right to consult with an attorney, to have a lawyer present while he was questioned, and even to have a lawyer appointed for him if he could not afford to retain one on his own, [this] conveyed to [the Defendant] the sum and substance of the rights that the Sixth Amendment provided him" such that his subsequent waiver was knowing. Id. Miranda warnings specifically inform defendants that they have the right to remain silent and the right to have an attorney present. Thus, Miranda warnings serve to make defendants aware of those specific rights.

Id. As stated by the United States Supreme Court in Patterson, "So long as the accused is made aware of the 'dangers and disadvantages of self-representation' during post-indictment questioning, by use of the Miranda warnings, his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" Patterson, 487 U.S. at 300.

Applying to this case the foregoing principles, we conclude that the Defendant's post-indictment statements were not obtained in violation of his Sixth Amendment right to counsel. Prior to the Defendant's arrest, Lieutenant Jones first interviewed the Defendant the day after this crime occurred, and he provided the Defendant Miranda warnings. The Defendant signed a waiver of his Miranda rights on January 14, 2002 and on January 15, 2002 and agreed to speak with the lieutenant. The lieutenant again interviewed the Defendant a month later, and he again provided the Defendant with Miranda warnings. The Defendant was arrested, and he was thereafter incarcerated in the Sumner County jail. From his cell, the Defendant requested an interview with Lieutenant Jones. He was again provided with Miranda warnings. The lieutenant spoke with the Defendant , and the Defendant provided no information about the murder. We conclude that the Defendant waived his Sixth Amendment right to counsel. The trial court did not err by admitting testimony about this interview.

## B. Photographs

The Defendant contends that the trial court erred when it admitted autopsy photographs into evidence. Specifically, he contends that the photographs did not add any probative value to the medical examiner's testimony and that any probative value was outweighed by the unfair prejudice. The State contends that the trial court properly admitted the autopsy photographs into evidence. Specifically, the State argues that the autopsy photographs corroborated the testimony of the medical examiner and showed how the victim died. The trial court held that:

> As to your 401 argument on relevance, I think clearly that they [the photographs] are relevant. There's no question about that. Really the whole question is your 403 argument, is the prejudicial value - - or is the prejudicial effect, does that outweigh the probative value?

> In this case you have referred to them as gruesome and invasive. I think they are also instructive as to the severity of the injuries. They are going to be used for corroboration of medical testimony, and they are going to be used to show the severity of the injuries to this child. So I do feel that they add something that perhaps the jury needs to see. So for those reasons, I am going to let the state use those, just those pictures that I was shown this morning.

Nine autopsy photographs were entered into evidence during testimony from the medical examiner, Dr. Deering. Exhibit 1 shows the victim's stomach cut open below her belly button with blood accumulating around her abdomen. Exhibit 2 shows the victim's teeth and gums with blood accumulated above her teeth. Exhibit 3 shows bruising on the victim's abdomen. Exhibit 4 shows the victim's shaved head with small, purplish bruises in the back. Exhibit 5 shows the victim's head before it was shaved for the autopsy. Exhibit 6 shows bruising on the interior area of the victim's lip. Exhibit 7 shows the interior of the victim's neck. Exhibit 8 shows bruising along the victim's spine. Exhibit 9 shows the victim as she came in the pink shirt with her arm up in the air in a state of full rigor mortis.

The determination of the admissibility of photographs lies within the sound discretion of the trial court. State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005); see Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 4.01[18][a], at 4-40 (5th ed. 2005). The decision of the trial court to admit a photograph into evidence will not be overturned on appeal absent a clear showing of an abuse of discretion. Thomas, 158 S.W.3d at 394. To be admissible, a photograph must be relevant to some issue at trial and the danger of unfair prejudice, confusion of the issues, or misleading the jury must not substantially outweigh its probative value. State v. Leach, 148 S.W.3d 42, 56 (Tenn. 2004). Generally, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Price, 46 S.W.3d 785, 815 (Tenn. Crim. App. 2000) (citing Banks, 564 S.W.2d 947,

951)). Photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the Defendant. Id.

Autopsy photos should be particularly scrutinized because "they present an even more horrifying sight and show the body in an altered condition." Id. In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Carlos Sommerville, No. W2004-01083-CCA-R3-CD, 2005 WL 729142, at *4 (Tenn. Crim. App., at Jackson, Mar. 30, 2005), *no Tenn. R. App. P. 11 application filed* (citing State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995)). Before any photograph can be admitted into evidence it must be verified and authenticated by a witness with knowledge of the facts. State v. Jacob Edward Campbell, No. M2003-00597-CCA-R3-CD, 2004 WL 508477, at *15 (Tenn. Crim. App., at Nashville, Mar. 15, 2004), *perm. app. denied* (Tenn. Oct. 4, 2004) (citing Banks, 564 S.W.2d at 949-50)).

In the case under submission, the trial court did not abuse its discretion when it allowed the autopsy photographs of the victim to be entered into evidence. First, we note that the photographs were relevant to the issue of the cause of the victim's death. The photographs were useful to assist the jury to understand Dr. Deering's testimony and to demonstrate the severity of the victim's injuries. Most of the injuries to the victim were internal, and the autopsy photographs were necessary to show the magnitude of the victim's injuries.

Next, we note that the trial court did not abuse its discretion when it determined the probative value of these photographs was not outweighed by unfair prejudice. These photographs were relevant to prove the cause of the victim's death and were not admitted solely to inflame the jury and prejudice them against the defendant. The photographs at issue are unquestionably unpleasant because they depict images of the victim's internal organs that were exposed during the course of the autopsy. However, the primary purpose of these photographs was not to elicit the jurors' emotions but rather to develop facts that were relevant to showing how the victim died. Consequently, the trial court did not abuse its discretion, and the Defendant is not entitled to relief on this issue.

### C. Expert Testimony of Anthony Green

The Defendant contends that the trial court erred when it allowed Anthony Green, an EMS personnel, to provide expert testimony although he was not qualified to testify as an expert. The State contends that the Defendant waived this issue by failing to object in a timely manner. The record reflects that Green testified about the bodily functions that occur when a person dies and the following dialogue ensued:

Defense Counsel: Judge, I have an objection at this point.

The Court: All right.

Defense Counsel: I really don't have any objection to Mr. Green testifying to CPR techniques or anything dealing with that. I'm not sure -- I'm objecting to him offering an expert opinion about this particular case about strangulation and how that impacts a person. I don't think -- even though he may be in premed studies, I don't think that qualifies as –

General Brown: I'm not asking about this specific case, Your Honor. I'm asking about a young child who dies from asphyxiation.

The Court: I'm going to overrule the objection and let him testify.

Green proceeded to explain that, after an individual's life functions cease, the percentage of defecation is going to be extremely high due to the fact of smooth muscle relaxation. Because Green provided testimony regarding an individual's life functions after defense counsel's objections, the Defendant did not waive the right to have this Court consider the issue on appeal.

On appeal, the trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. State v. Dubose, 953 S.W.2d 649, 651 (Tenn. 1997). The abuse of discretion standard contemplates that, before a ruling will be reversed, the record must show that a judge applied an incorrect legal standard, or reached a decision that is against logic or reasoning and caused an injustice to the party complaining. State v. Reid, 91 S.W.3d 247, 294 (Tenn. 2002).

Pursuant to Tennessee Rules of Evidence section 701:

If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness, helpful to clear understanding of the witness's testimony, or their determination of a fact at issue, or value.

Pursuant to Tennessee Rules of Evidence 702, expert scientific testimony is admissible "if scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Evidence is "'scientific, technical, or other specialized knowledge' if it concerns a matter that 'the average juror would not know, as a matter of course . . . .'" State v. Torrey Lyonel Frazier, No. E2000-01364-CCA-R3-CD, 2001 WL 1627601 at *5 (Tenn. Crim. App., at Knoxville, Dec. 19, 2001), *no Tenn. R. App. P. 11 application filed* (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)).

In the case under submission, the trial court abused its discretion when it allowed Green to testify about an individual's tendency to defecate after his or her life functions cease. Green had not been qualified to testify as an expert, and, pursuant to Tennessee Rule of Evidence 702, the trial court erred when it allowed him to provide testimony about a human's bodily functions upon death. Such testimony pertains to information outside the common knowledge of an average juror.

Nevertheless, this error is harmless due to the substantial evidence used to convict the Defendant and the relatively benign testimony offered. Whether the victim defecated before or after she died does not affect the validity of the evidence presented at trial indicative of the Defendant's guilt. Therefore, the Defendant is not entitled to relief on this issue.

### D. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his convictions for aggravated child abuse and first degree felony murder. Specifically, he argues that the evidence presented at trial failed to establish that the Defendant acted knowingly and that the Defendant caused the victim to receive serious bodily injury. The State contends that sufficient evidence was presented to support the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). "[Before an accused can be convicted of a criminal offense based on circumstantial evidence alone, the facts and circumstances 'must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant . . . .'" State v. Rains, 882 S.W.2d 376, 380 (Tenn. Crim. App. 1994) (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" Id. (quoting Crawford, 470 S.W.2d at 613).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see

the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A person commits aggravated child abuse who "commits the offense of child abuse ... as defined in § 39-15-401[,] and . . . [t]he act of abuse . . . results in serious bodily injury to the child[.]" T.C.A. § 39-15-402(a)(1) (2006). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen years of age in such a manner as to inflict injury...." T.C.A. § 39-15-401(a) (2006). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-106(a)(20). First degree felony murder, as relevant here, is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." T.C.A. § 39-13-202(a)(2) (2006). For first degree felony murder, "no culpable mental state is required for conviction . . . except the intent to commit the enumerated offense[]." T.C.A. § 39-13-202(b).

There was sufficient evidence presented at trial for a rational trier of fact to find beyond a reasonable doubt the Defendant guilty of aggravated child abuse and first degree felony murder. The evidence presented at trial established that the two and a half year old victim was severely beaten and suffocated to death. Dr. Deering's testimony established that the victim suffered from serious bodily injury. His testimony about the victim's extensive injuries provides sufficient evidence to show that the perpetrator of the crime was reasonably certain that his actions would cause the victim to receive serious bodily injury. Dr. Deering testified that the victim's injuries indicate that she was strangled to death and was possibly thrown against a wall. At the time of the offense, the only persons present at the scene were the Defendant, the victim's mother, the victim, and an infant boy. The record reflects that the Defendant's behavior on the night of the crime suggests that he was the individual who beat the victim and caused her death. The victim's mother awoke around midnight because the Defendant was screaming for her to "come and get this f*c*king kid," in reference to the victim. The Defendant and the victim's mother had frequently argued because the Defendant felt that the victim's mother did not properly discipline the victim. When the victim's mother found the victim in a state of full rigor mortis and called 911, the Defendant told the victim's mother not to call 911 and said, "I don't need this sh*t."

The Defendant performed C.P.R. on the victim when she was stiff, cold, and in full rigor

mortis. The victim's mother stated that, when she was making the 911 phone call, the Defendant told her that the victim was breathing and had a pulse. The evidence presented at trial indicates that the child could not have had a pulse because she was in a state of rigor mortis and suggests that the Defendant performed C.P.R. on the victim even though he knew she was dead. He also told an employee with the Department of Children's Services that he felt guilty about what happened to the victim and asked if he could have bruised the victim when he tried to perform C.P.R. Lieutenant Jones felt that the Defendant lied to him throughout the course of the police investigation, and the Defendant admitted that he had been deceptive. These statements suggest that the Defendant was deceptive about his C.P.R. performance in order to hide the fact that he had suffocated the victim. This evidence is sufficient to sustain the Defendant's convictions. Again we note that questions about the weight and value of the evidence are resolved by the trier of fact, and an appellate court does not re-weigh or re-evaluate the evidence. See State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003). The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE